IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 8, 2002

## STATE OF TENNESSEE v. JERRY MCPEAK, IV

**Direct Appeal from the Circuit Court for Madison County**
**No. 98-160     Roy B. Morgan, Jr., Judge**

---

**No. W2001-00764-CCA-R3-CD  - Filed February 14, 2002**

---

The Appellant, Jerry McPeak, IV, was convicted by a Madison County jury of aggravated robbery. On appeal, McPeak raises the following issues for our review: (1) Whether the evidence was sufficient to establish that the victim suffered serious bodily injury; (2) whether the evidence was sufficient to establish that the assault occurred during the act of robbery; and (3) whether McPeak was convicted solely upon the uncorroborated testimony of an accomplice. After review, we find the issues raised to be without merit and affirm the judgment of the trial court.

### Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.

DAVID G. HAYES, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Mike Mosier, Jackson, Tennessee, for the Appellant, Jerry McPeak, IV.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Jody Pickens, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### Factual Background

The victim, Davis Teague, worked as a truck driver for T & T Inland Container of Nesbit, Mississippi. On September 16, 1997, Teague was in Jackson, Tennessee, picking up a load from Procter & Gamble. At approximately 9:30 p.m., Teague stopped at an Amoco station and used the pay phone outside to call home.

As Teague was conversing with his wife, a dark-colored vehicle driven by the Appellant parked next to the payphone. Teague described what happened next as follows:

> Well, one of them come up, and I told him I'd be off the phone in just a minute. He said he didn't want to use the phone, he wanted my money . . . and the one standing over here, he was hollering he was going to shoot me, so I turned to look at him, and when I turned back, the other one hit me [in the nose] and knocked me into the bushes . . . they pulled me out of the bushes and got my billfold [and] $29 . . . I asked them for my wallet back, and they brought me my wallet back and then started kicking me . . . in the neck and head [and] jaw.

Leslie Flowers, a customer who was leaving the Amoco store, overheard "yelling" and first assumed that it was "just a bunch of kids." As she was driving away, however, she noticed "a guy sitting on top of another person on the ground." Flowers witnessed the man striking the person on the ground and also remembered two other men being present at the scene. Flowers heard someone scream, "give me your wallet" and testified that:

> I went down the street a little bit, and then I hit my brakes and I just turned around and went back on the opposite side of the store. When I did that, then the two people that I saw that were outside of the car jumped in the car and they took off.

Flowers motioned to the cashier inside the station to call for emergency assistance as she ran to help the victim. When Flowers reached the victim, she noticed that he was not moving and was bleeding from "his nose, mouth, ears, just cuts all over his face." Flowers was unable to acquire a license plate number from the vehicle because "a sheet or something had been draped out of the trunk, and then the trunk shut so that you couldn't see the license plate."

Brad Pusser, the cashier and night stocker at the Amoco store, also testified that he saw "three individuals jump on an old man at the pay phone." Pusser explained that he was too far away to identify any of the three and by the time he got out of the cashier's bullet proof security "box," the robbers had fled. Pusser testified that he found the victim conscious but incoherent after the attack. He described the victim as "severely beaten" with "blood coming out of his nose . . . right eye and out of his chin." Pusser was able to describe the vehicle to police as a "two-tone LTD, [with] a blue rag top, light blue on the middle and dark blue on the top and bottom."

Tim Coffman, a co-defendant, testified that he, the Appellant, Brad Sikes, and Clifford Benalstein went "riding around, partying, [and] whatnot" that night. They decided to purchase some beer and drove to the Amoco station. As the Appellant drove into the Amoco parking lot, Coffman instructed the Appellant, who was driving a Ford LTD, to drive towards the pay phone so they could rob the victim. Coffman explained that robbery of the victim had been discussed at this point. The Appellant complied. Coffman and Benalstein got out of the car and approached the victim. When the victim failed to respond to their demand for money, Benalstein hit the victim in the face and knocked him into the bushes. The Appellant then got out of the car while Coffman removed the victim from the bushes, rolled him over, and took his wallet. Coffman testified that the Appellant

then began kicking the victim in the head. Coffman pulled the Appellant off the victim and they fled the scene. Coffman testified that all four agreed to use the robbery proceeds to purchase marijuana. The Appellant immediately drove to a house where one of the accomplices went inside and purchased marijuana with the money taken from the victim. The Appellant then drove his accomplices to a store to purchase rolling papers.

Brad Sikes, also indicted as a co-defendant, was called to testify as a defense witness at trial. Sikes testified that he, the Appellant, Coffman and Benalstein drove to the Amoco to purchase beer. Once there, the Appellant circled the parking lot until he noticed the victim using the pay phone. According to Sikes, "that's when we seen the guy standing at the pay phone and just decided to rob him." Contrary to Coffman's testimony, Sikes denied any involvement in the discussion or planning of the robbery of the victim. At trial, Sikes testified that the Appellant got out of the vehicle and began kicking the victim after Coffman and Benalstein had taken the victim's wallet and gotten back into the car. Sikes admitted, however, that he had told police just after the incident that the Appellant got out of the car and kicked the victim before the victim's wallet was taken. After they left the scene, the Appellant drove them to purchase drugs and rolling papers.

At trial, the victim testified that he suffered a broken nose, a broken jaw, and was hospitalized on three separate occasions following the attack. Teague subsequently lost hearing in his left ear and underwent surgery to repair the damage to his nose and jaw. As a result of the physical injuries sustained, Teague was forced to retire and has subsequently filed for Chapter 7 bankruptcy. Teague identified the Appellant as being one of the persons present during the attack.

## SUFFICIENCY OF THE EVIDENCE

A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this Court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *See generally State v. Adkins*, 786 S.W.2d 642, 646 (Tenn. 1990); *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). Instead, the defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994), *cert. denied*, 513 U.S. 1086, 115 S. Ct. 743 (1995); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992), *cert denied,* 507 U.S. 954, 113 S. Ct. 1368 (1993).

### A. Serious Bodily Injury

The Appellant contends that the proof presented at trial was insufficient to support his conviction for aggravated robbery. Specifically, he asserts that the evidence presented was insufficient to establish that the victim suffered serious bodily injury. In order to sustain a conviction for aggravated robbery, as charged in the indictment, the State was required to prove that a robbery was committed and that the victim of the robbery suffered serious bodily injury. Tenn. Code Ann. § 39-13-402.

"Serious bodily injury" is bodily injury involving:

(A)     A substantial risk of death;
(B)     Protracted unconsciousness;
(C)     Extreme physical pain;
(D)     Protracted or obvious disfigurement; or
(E)     Protracted loss or substantial impairment of a function
          of a bodily member, organ or mental facility.

Tenn. Code Ann.§ 39-11-106(a)(34).

The proof at trial established that the victim was violently struck in the face by Benalstein and kicked in the head and face between ten to twenty times by the Appellant. The beating caused the victim to bleed from the nose, the mouth and the ears. It was not disputed at trial that, as a result of the assault, the victim sustained a broken nose, a broken jaw and was hospitalized on three separate occasions. Surgery was required to repair his nose and jaw. Prior to the attack, Teague utilized a hearing aid in his *right* ear so that he could better distinguish sounds. After the attack, Teague testified that he lost hearing completely in his *left* ear, the ear which had no problems prior to the attack.

Permanent hearing loss constitutes a substantial impairment of a function of a bodily member or organ. Tenn. Code Ann. § 39-11-106(a)(34)(E). The distinction between "bodily injury" and "serious bodily injury" is generally a question of fact for the jury and not one of law. The jury, and not this court, heard the victim's testimony concerning the injuries he sustained from the attack. A rational jury could have found, based upon the brutal nature and number of blows inflicted and from the extent of the injuries, as manifested by bleeding from the nose, mouth and ears, that the victim sustained a permanent hearing impairment. Accordingly, we find the evidence sufficient to support a finding of serious bodily injury.

### B. Criminal Responsibility

The Appellant argues the evidence presented at trial was insufficient to support his conviction for aggravated robbery because the definition of aggravated robbery "necessarily requires that the victim suffer serious bodily injury during the act of robbery" and "the proof in this case shows that the only actual involvement of the [Appellant] was that he assaulted the victim after he had been beaten and robbed." The Appellant's argument of criminal liability is misplaced. A person is

criminally responsible for a crime not only by his own conduct but by the conduct of another for which the person may be criminally responsible. Tenn. Code Ann. § 39-11-401. A person becomes criminally responsible for an offense committed by another if "acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). A defendant convicted under a theory of criminal responsibility is guilty to the same degree as the principal who committed the crime and is considered to be a principal offender. *State v. Carson*, 950 S.W.2d 951 (Tenn. 1997).

The evidence presented at trial established that the Appellant borrowed his cousin's car and drove three passengers to the Amoco Station. The license plate on the car driven by the Appellant was covered by "a sheet or something" that had been draped out of the trunk. The occupants of the vehicle had discussed robbery of the victim. The Appellant, as instructed, drove to the pay phone to assist in the commission of the robbery. The attackers punched the victim in the face, threw him into the bushes, took his wallet, and then began kicking him repeatedly in the head, neck and jaw. The Appellant then sped away from the scene and took his passengers to purchase drugs with the money taken from the victim. We find from these facts that a rational jury could have reasonably concluded that the Appellant and his co-defendants united with common intent to perpetrate a robbery of the victim, that the Appellant assisted in the commission of the offense, and that the Appellant benefitted in the proceeds. Accordingly, the Appellant was criminally responsible for aggravated robbery of the victim based upon his own conduct and the conduct of his accomplices.

### C. Accomplice Testimony

The Appellant asserts that the evidence presented at trial was insufficient to support the verdict because he was convicted solely on the uncorroborated testimony of his two accomplices. Specifically, he contends that, "none of the other witnesses, including the victim, can identify the [Appellant] as one of the assailants."

Our analysis begins with the well-settled premise that convictions may not be based solely upon the uncorroborated testimony of accomplices. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001)(citing *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). "An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Accomplices cannot corroborate each other. *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995). Notwithstanding, Tennessee law only requires a modicum of evidence in order to sufficiently corroborate accomplice testimony. *State v. Copeland*, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984).

Our supreme court has set forth the quantum of proof necessary to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent

corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Shaw*, 37 S.W.3d at 903 (quoting *Bigbee*, 885 S.W.2d at 803). It is generally for the jury to determine whether sufficient corroboration exists. *Shaw*, 37 S.W.3d at 903.[1]

Although he has no recollection of the Appellant actually striking him, we first note that Mr. Teague identified the Appellant as being one of the three men who got out of the vehicle and approached him at the payphone. Moreover, the Amoco cashier testified that he witnessed the victim being attacked and was able to give police a description of the get-away car. The description of the car matched the vehicle being driven by the Appellant when arrested shortly thereafter. Thus, the Appellant's conviction does not stem solely from accomplice testimony as alleged by the Appellant in his brief. The proof established that the Appellant was aware of the planned robbery of the victim. Additionally, Coffman testified that the Appellant assisted in the robbery by driving the car, was involved in the beating of the victim and that the Appellant also shared in the proceeds of the robbery. Sikes also placed the Appellant at the scene of the robbery and that the Appellant was involved in the beating of the victim. We conclude from these facts that sufficient evidence was introduced to corroborate the accomplice testimony regarding the Appellant's involvement and guilt in the robbery.

## CONCLUSION

---

[1] Notwithstanding the established rule of accomplice corroboration, we are constrained to note that the jury was not instructed that the testimony of Coffman, who was an accomplice as a matter of law, was required to be corroborated. *See* T.P.I.- Crim. 5th Ed. 2000 § 42.09(a). Moreover, the jury was not instructed that the issue of whether the witness, Sikes, was an accomplice was a question of fact to be decided by the jury and that if Sikes was found to be an accomplice, corroboration of his testimony was also required. *See* T.P.I. - Crim. 5th Ed. 2000 § 42.09; *see also State v. Anderson*, 985 S.W.2d 9, 17 (Tenn. Crim. App. 1997). In *Anderson*, this court observed:

> A trial court has a duty to give a complete charge of the law applicable to the facts of the case. . . . [T]he accomplice rule bears directly upon what evidence is deemed sufficient to allow for a rational trier of fact to find guilt beyond a reasonable doubt. . . . [O]ur supreme court has held that an instruction on the rule requiring corroboration of an accomplice's testimony is not fundamental. Upon the trial court's failure to instruct the jury regarding accomplice testimony and the requirement of corroboration, it becomes the obligation of the defendant to make a special request for the instruction. In the absence of a special request, the trial court does not err by failing to instruct the jury about accomplice testimony even if the circumstances of the case warrant such an instruction. (citations omitted).

Failure to make a special request that the trial court instruct on accomplice corroboration constituted waiver of the issue in this case.

After review, we find the evidence presented at trial sufficient to support the Appellant's conviction for aggravated robbery and affirm the judgment of the Madison County Circuit Court.

_____
DAVID G. HAYES, JUDGE